WANNMACHER and another, Respondents, vs. BALDAUF
CORPORATION, Appellant.*

*November 5—December 2, 1952.*
*March 6—March 31, 1953.*

* Rehearing granted, opinion on rehearing, post, p. 539b.

524

For the appellant there was a brief by *Quarles, Spence & Quarles* and *Raymond H. Kleis,* attorneys, and *Arthur Wickham* and *Richard S. Gibbs* of counsel, all of Milwaukee, and oral argument by *Mr. Gibbs, Mr. Wickham,* and *Mr. Kleis.*

For the respondents there was a brief by *George Timmerman,* attorney, and *Austin W. Kivett* and *Kent W. Michaelson* of counsel, all of Milwaukee, and oral argument by *Mr. Timmerman* and *Mr. Kivett.*

Currie, J. This appeal presents the question of whether the plaintiffs are entitled to maintain their causes of action against the defendant landlord, it being the contention of counsel for said defendant that there is no liability on the part of the landlord as a matter of law.

While appellant's counsel contends that Mrs. Wannmacher at the time of accident was a trespasser and not a licensee or frequenter, we will assume for the purposes of this opinion, without deciding such issue, that she was not a trespasser but a frequenter, and had a lawful right to be where she was at the time she fell through the trap-door opening.

It is clear that at common law the existence of a trap door does not constitute a nuisance or defect in the premises and a landlord cannot be held liable to one who falls through the trap-door opening and is injured in premises in the possession and under the control of a tenant. *Morrison v. McAvoy* (1902), 7 Cal. Unrep. 37, 70 Pac. 626; *Lyman v. Hermann* (1938), 203 Minn. 225, 280 N. W. 862; and *Torpey v. Sanders* (1936), 248 App. Div. 303, 289 N. Y. Supp. 532.

However, counsel for plaintiffs contend that the defendant landlord in the instant case, by failure to enclose the trap-door opening with a railing, violated the safe-place statute (sec. 101.06, Stats.), certain safety orders of the Wisconsin industrial commission, and provisions of the building-code ordinances of the city of Milwaukee, and predicated the plaintiffs' right to recover against the landlord upon these grounds.

We will first approach the problem from the standpoint of whether the safe-place statute (sec. 101.06, Stats.), independently of any safety order of the Wisconsin industrial commission or city ordinance, does impose liability on the defendant landlord in this instance.

Sec. 101.06, Stats., reads as follows:

"Every employer shall furnish employment which shall be safe for the employees therein and shall furnish a place of employment which shall be safe for employees therein and

for frequenters thereof and shall furnish and use safety devices and safeguards, and *shall adopt and use methods and processes reasonably adequate to render such employment and places of employment safe,* and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees and frequenters. *Every employer and every owner of a place of employment or a public building now or hereafter constructed shall so construct, repair, or maintain such place of employment or public building, and every architect shall so prepare the plans for the construction of such place of employment or public building, as to render the same safe."* (Emphasis supplied.)

While a trap door when closed presents no hazard to patrons of a store or other business establishment, the situation resulting from the door being left open in a floor area to which frequenters are permitted access is highly dangerous and renders the premises unsafe. So far as a tenant in possession, such as the defendant Pulos, is concerned there is no doubt but that he may be held liable on the ground of violation of the safe-place statute if a frequenter falls into the unguarded opening. Is the landlord-owner also liable? While at first blush the words of sec. 101.06, Stats., requiring an *"owner"* to so *"maintain"* a place of employment or public building *"as to render the same safe"* would seem to be inclusive enough to impose liability on the landlord for damages sustained by a patron of the tenant falling into such an unguarded opening, nevertheless, such a result would seem most harsh in view of the fact that the landlord was out of possession and had no control over the action of the tenant in failing either to keep the door closed when patrons were about, or to effectively guard the opening. A review of the earlier decisions of this court construing the statute is necessary in order to reach the correct conclusion.

Opposing counsel disagree as to whether the tenancy at the time of the accident was one from year to year, or month to month. We deem it to be immaterial which of these two

types of tenancy existed inasmuch as the landlord at the time of the accident was not only out of possession but had no right to possession because no notice to terminate the tenancy under either sec. 234.03, or sec. 234.07, Stats., had been given. While we held in *Johnson v. Prange-Geussenhainer Co.* (1942), 240 Wis. 363, 2 N. W. (2d) 723, that a duty on the part of the landlord to make repairs carries with it a right of entry and control over the leased premises, there is no claim made that the landlord in the instant case had any duty to repair imposed by the terms of the leasing arrangement. In the absence of such duty to repair, the landlord had no right of entry or control. 32 Am. Jur., Landlord and Tenant, p. 186, sec. 196.

In *Freimann v. Cumming* (1924), 185 Wis. 88, 200 N. W. 662, the plaintiff sought to recover from the defendant for personal injury caused by the defective condition of the top stair in a two-story office building, on the ground that the defendant was liable therefor as an "owner" under the safe-place statute. Prior to the accident the defendant had sold the premises under land contract and the vendee was in possession when plaintiff was injured. This court held that the defendant was not liable under the safe-place statute, and stated (p. 91):

"Considering the language and general purpose of this statute, we now hold that in order to place such a liability as is here claimed against one as the *owner* of such premises there must exist in such person the right to present possession or present control or dominion thereover so that such person may lawfully exercise the rights necessary to permit him to properly enter upon the premises in order to perform such an ever-present duty as is fixed by this statute. A present right of possession is necessarily involved in the idea of a present duty to make repairs or changes."

While the case of *Freimann v. Cumming, supra,* passed upon the liability of a vendor and not a landlord, under the

safe-place statute, the same principle would seem to apply in cases involving liability of a landlord. In *Kinney v. Luebke-man* (1934), 214 Wis. 1, 252 N. W. 282, this court did rely upon the principle announced in *Freimann v. Cumming* in denying recovery to a plaintiff who sought to hold a landlord liable for personal injuries under the safe-place statute. In the latter case the plaintiff, a patron of a restaurant operated by a tenant, fell down basement stairs while on her way to a toilet, and the defect relied upon to establish liability was the failure to have an electric light turned on. The landlord had provided a light in the ceiling and there was no dispute but that, if the light had been turned on at the stairhead, the stairway would have been sufficiently lighted to render it safe. This court in its opinion said (pp. 4, 5):

". . . where the only thing required to render a place safe is the turning on or continuous maintenance of an electric current to an electric light that is sufficient to render the place safe when the current is on, and the premises are occupied by a tenant who is conducting business therein such as to make the place within a public building within the meaning of the statute, the performance of this duty rests upon the tenant and not upon the landlord. . . .

"The owners in the instant case had no such possession of the premises, and no such ever-present right of control or dominion thereover as to render them responsible for either constant maintenance of the light or for turning on the light whenever the stair was in use."

In *Holcomb v. Szymczyk* (1925), 186 Wis. 99, 202 N. W. 188, the plaintiff was injured by falling on a wooden platform at the second-story level upon which the rear entrance of a flat of a four-apartment two-story building opened. The jury found that the plaintiff's fall was caused by slipping upon ice formed on the platform and that the building, as it existed at the time of the accident, was not constructed so as to be as safe to tenants occupying it as the nature of the building would permit. The jury further found the building

on such day was not in a reasonably safe condition, and such fact was the proximate cause of plaintiff's injury. The question before the court was the liability of the defendant landlord. It was contended in behalf of plaintiff that the platform could have been rendered safe by constructing a roof extending over it. The court, in holding the landlord not liable under the safe-place statute, stated (p. 104):

"It is well known to every one and must have been known to the legislature that there are thousands of buildings in the state of Wisconsin constructed in just the manner that this building was constructed, used, and occupied so as to bring them within the classification of public buildings as defined in the statute. It is difficult to believe that the legislature intended to throw upon these owners the burden of practically insuring the occupants thereof against possible injury by compelling them to cover every part of the premises so as to protect the same against snow, ice, and rain. It is considered that a building is safe, within the meaning of the statute, which is composed of proper materials and is structurally safe, and that *the statute does not apply to temporary conditions having no relation to the structure of the building or the materials of which it is composed. Juul v. School Dist.* 168 Wis. 111, 169 N. W. 309." (Emphasis supplied.)

Applying the principles of the foregoing decisions to the instant case, it is well known that there are thousands of buildings in the state of Wisconsin constructed with trap doors. A trap door in itself does not constitute a structural defect in the premises. It presents a danger only when the door is left open, and the opening and closing of the door in this case was entirely within the exclusive control of Pulos, the tenant. The leaving of the door open by Pulos, or his employees, was a temporary condition, such as the failure to have the light turned on in the *Kinney v. Luebkeman Case,* and the tenant Pulos alone would be liable for Mrs. Wannmacher's injury, unless there existed some safety order of the industrial commission or city ordinance which required the landlord to construct a railing around the trap door.

Plaintiffs' counsel contend that even in the absence of any such safety order or ordinance the plaintiffs would be entitled to recovery against the defendant landlord upon the finding of the jury that the landlord violated the safe-place statute by failing to provide an adequate railing around the trap door. Plaintiffs called as expert witnesses a civil engineer and two architects who testified that the premises could have been rendered safer by construction of a guardrail around the trap door. This court in *Bunce v. Grand & Sixth Building, Inc.* (1931), 206 Wis. 100, 238 N. W. 867, held that a jury question was presented as to whether steps in a toilet room were reasonably safe within the safe-place statute, notwithstanding the fact that it was conceded that there was no city ordinance or safety order of the industrial commission which was applicable to the situation there presented. However, Mr. Chief Justice ROSENBERRY, in the decision of *Heckel v. Standard Gateway Theater* (1938), 229 Wis. 80, 84, 281 N. W. 640, in construing the safe-place statute, declared:

"The safe-place statute (sec. 101.06) does not require the owner of the premises resorted to by the public to do the impossible *or the unreasonable* in maintaining its premises in a safe condition." (Emphasis supplied.)

In the light of such holding in *Heckel v. Standard Gateway Theater, supra,* and our decision in *Holcomb v. Szymczyk, supra,* would it be requiring *"the unreasonable"* to have required the defendant landlord in the instant case to have constructed a railing around the trap door? In passing on this question we must take cognizance of the fact that trap doors are widely used in those locations in which sufficient floor space cannot be sacrificed to provide a permanently open well for a staircase to attain access to the basement below. A trap door when closed entails no loss of floor space. In the instant case, for example, the leased store was only 18 x 18 feet in size and floor space was at a premium so that the installation of a trap door was an ideal solution of the prob-

lem of how to provide access to the basement without loss of the use of valuable floor space. To require the installation of a permanent railing around a trap door would totally destroy its utility because it would render useless as floor space the area of the door when closed, such being the very objective for which it was installed in the first place.

In *Torpey v. Sanders, supra,* the appellate division of the New York supreme court declared (248 App. Div. 305) :

"A trap door is designed for temporary and expeditious use, with as little interference with the use of the floor space which it occupies as possible. Its construction shows that it is not intended to be kept open for any length of time. The free use of the floor space is of much greater importance than the stairway during business hours. No possible danger could be feared from the opening or the trap door in this case when the door was in place."

In view of the fact that a permanent railing around a trap door would destroy its intended utility of having the door when closed serve as useful floor space, we cannot resist the conclusion that to require such a railing would be to require *"the unreasonable"* of the landlord-owner in absence of any ordinance or safety order specifically so providing. We, therefore, are of the opinion that it does not lie within the province of a jury to find that a landlord-owner violated the safe-place statute by failing to install such a railing.

We now come to the consideration of the contention by plaintiffs' counsel that there were specific safety orders of the industrial commission, and provisions of ordinances of the city of Milwaukee, which required the defendant landlord to have installed a railing around the trap door.

Order No. 55 of the General Orders on Safety issued by the industrial commission, effective March 13, 1935, provides :

"Pits, manholes, and openings in floors, platforms, and sidewalks shall be guarded in accordance with the require-

ments of Order B-1. If a trap door is used the door and hinges shall be flush with the floor and the door shall have a rough and nonslip surface."

Order B relates to standards and specifications and is an attempt on the part of the commission to specify the manner in which various protective devices are to be constructed and their materials. Thus, Order B-1, relating to railings and toeboards, provides:

"Where standard railings and toeboards are called for in these orders, they shall conform to the following specifications:"

There is no specific order called to our attention, or which we have been able to find, providing that railings and toeboards are required around a trap-door opening. In construing the orders on safety, the general definition contained in Order A must govern. It is provided therein:

"*Guarded.* When used in these orders, the term 'guarded,' *unless otherwise specifically provided, shall mean so covered,* fenced, or enclosed that a person in the course of employment is not liable to come in contact with the point of danger and be injured." (Emphasis supplied.)

It will be noted that one may "*guard*" an opening by enclosing it, fencing it, or *covering* it. This is the explanation of the latter part of the provision of Order 55 relating to a trap door. It is a recognition that the use of a trap door with hinges flush with the floor and with a nonslip surface is a complete compliance with Order 55, under the definitions contained in the General Orders on Safety. There was no showing that the trap-door hinges were not flush with the floor or that the door when closed did not have a nonslip surface, and there is no claim made that the accident was caused by the plaintiff tripping over the hinges or slipping upon a slippery surface.

Plaintiffs also rely upon Order 5410 of the Wisconsin state building code, which order was promulgated by the industrial commission so as to be effective July 29, 1942. Such order reads as follows:

"*Order 5410. Trap doors and floor openings.* Every opening through any floor or through any roof used by the public or by employees shall be guarded by a substantial enclosure or rail not less than three feet six inches high. . . ."

At the time the defendant Baldauf Corporation acquired title to the leased premises in 1938, subject to the tenancy of the defendant Pulos, Order 5410 was not in effect, and was not adopted until approximately four years later. Failure to comply with a general safety order of the industrial commission applying to places of employment, or public buildings, constitutes a violation of the safe-place statute.

A landlord at common law is under no obligation to enter and make repairs, or alterations, unless such duty is imposed upon him by the provisions of the lease. *Johnson v. Prange-Geussenhainer Co., supra; Kinney v. Luebkeman, supra;* and 51 C. J. S., Landlord and Tenant, p. 1071, sec. 366. Does the safe-place statute effect a change in this common-law rule and impose a duty upon a landlord to make repairs, or alterations, in premises which were structurally safe at the time of leasing even though the landlord has no duty under the leasing arrangement to make repairs? This court has answered this question in the negative. In *Bewley v. Kipp* (1930), 202 Wis. 411, 414, 233 N. W. 71, this court, speaking through Mr. Chief Justice ROSENBERRY, stated:

"Under the principles of the common law the lessor was under no obligation to repair unless he assumed such obligation by the terms of the lease. Concededly this statute [safe-place statute] was not intended to, and does not, affect the relative duties of landlord and tenant in this respect in cases where there is a single tenant of a demised building. While this is not conclusive, *it is a most significant indication that*

*by this legislation the legislature was not intending to regulate or modify the common-law relation of landlord and tenant."* (Emphasis supplied.)

The holding in *Bewley v. Kipp, supra,* is in accord with the principle that this court announced in *Freimann v. Cumming, supra,* that in order to hold an "owner" liable under the safe-place statute, he must possess the right of entry so as to be able to do that which is necessary to make the premises reasonably safe.

It is therefore our conclusion that while Order 5410 may have been applicable to the defendant Pulos, it had no application to the defendant landlord because at all times since it was adopted in 1942, the landlord was out of possession with no right of entry to the leased premises.

Plaintiffs' brief cites *Schaefer v. Fond du Lac* (1898), 99 Wis. 333, 340, 74 N. W. 810, as holding that an owner who purchases premises in a defective condition and then leases the same to a tenant, or allows the tenant to continue possession under such conditions as to indicate permission to continue the defects, may be held liable for injuries to a third person resulting from such defects. That case involved a defect in a street-railway track in a public street which already existed when the new owner acquired title and entered into a new arrangement with the street-railway company permitting it to continue in possession with an option to purchase. The *Schaefer Case* is readily distinguishable from the instant case because in 1938, when the defendant Baldauf Corporation acquired title, the trap door did not constitute a structural defect in the leased premises.

There remains but the question of whether there was in existence an applicable ordinance of the city of Milwaukee requiring the defendant landlord to erect a permanent railing around the trap door. Ordinance 13-15(c) comes the closest to having any application, and states as follows:

"All new or existing pits for boilers, furnaces, greasing, meters, *stairwells* and all other new or existing floor pits or depressions or where there is a change in floor level shall be provided at all sides, except where such protection may be waived or modified by the inspector of buildings, with railing as required in paragraph (b) of this section. All such railings shall be securely anchored to the floors." (Emphasis supplied.)

In the case of *Staples v. Senders* (1940), 164 Or. 244, 96 Pac. (2d) 215, 101 Pac. (2d) 232, the plaintiff was a patron of an antique and secondhand shop operated by a tenant of the defendant landlord, and fell through an opening in the floor caused by a trap door covering a stairway leading down into the basement having been left open. A .section of the building-code ordinance of the city of Portland provided as follows (p. 252):

"All stairways over three (3) risers in height shall have a substantial railing along the outside of same and if stairs are over four (4) feet or more in width, a railing shall be provided on both sides. Substantial railings shall be provided for wellholes of stairs and all handrails to be used by the public shall be at least thirty (30) inches in height measured vertically in the center of treads or in the center of platform landings."

The Oregon court came to the conclusion that the landlord was not liable and in reaching such conclusion it was necessary to construe the above-quoted ordinance. The pertinent portion of the court's opinion on this point is as follows (p. 261):

"Ordinarily trap doors in buildings cover a flight of stairs, and about the only purpose they serve is to form a part of the floor when not open and thus permit the free use of that portion of the floor space. See *Torpey v. Sanders,* 248 App. Div. 303, 289 N. Y. S. 532. If they must be surrounded by railings this utility is lost, and the trap doors themselves might as well be abolished. We are not now questioning the power of the city council to enact a regulation abolishing

them, but only calling attention to the consequences of attaching to the ordinance the meaning insisted upon by the plaintiff.

"The regulations do not refer specifically to trap doors, but to wellholes of stairs. A wellhole is defined as 'the open space in a floor, to accommodate a staircase' (Funk and Wagnall's New Standard Dictionary), and in a literal sense that definition may be said to fit the case when the trap door is open, though obviously it does not when the trap door is closed. We are, therefore, faced with an ambiguity in the ordinance as it is attempted to be applied here, and *we think it accords more with common sense to take the view that the city council had no intention of requiring property owners to build handrails around what most of the time is, to all intentions and purposes, a part of the floor of the building, and thus to destroy the only utility that a trap door possesses.* This also holds true with respect to a stair railing extended through a trap door and above the floor." (Emphasis supplied.)

While the Milwaukee city ordinance uses the term *"stairwells"* and the Portland ordinance employs the phrase *"wellholes of stairs,"* the two expressions are synonymous and we therefore hold that ordinance 13-15(c) of the city of Milwaukee must be construed as not applying to trap doors covering a flight of stairs.

It is our conclusion that the defendant landlord Baldauf Corporation cannot be held liable by the plaintiffs in this action on any of the grounds advanced by plaintiffs' counsel and considered in this opinion, and that the judgment as to such defendant must be reversed and the action dismissed as to it.

*By the Court.*—Judgment reversed as to the defendant Baldauf Corporation only and cause remanded with directions to dismiss the action as to said defendant.

A motion for rehearing was granted on February 3, 1953, and oral argument was heard March 6, 1953.

For the appellant there were briefs by *Quarles, Spence & Quarles* and *Raymond H. Kleis,* attorneys, and *Arthur Wickham* and *Richard S. Gibbs* of counsel, all of Milwaukee, and oral argument by *Mr. Gibbs, Mr. Wickham,* and *Mr. Kleis.*

For the respondents there was a brief by *George Timmerman,* attorney, and *Austin W. Kivett* and *Kent W. Michaelson* of counsel, all of Milwaukee, and oral argument by *Mr. Timmerman* and *Mr. Kivett.*

The following opinion was filed March 31, 1953:

CURRIE, J. (*on rehearing*). In our original opinion herein we stated that it did not lie within the province of the jury to find that the defendant landlord violated the safe-place statute by failing to guard the trap-door opening with a railing in the absence of any ordinance or safety order so providing. We further held that Order 5410 of the Wisconsin state building code did not apply inasmuch as when the defendant landlord acquired title in 1938 there was no structural defect in the premises, and thereafter it never had any right of entry or possession to enable it to comply with Order 5410, which we stated was promulgated so as to be effective July 29, 1942.

Counsel for the respondent plaintiff in their brief in support of their motion for rehearing for the first time called to the attention of the court the provisions of Order 5409 which became effective October 9, 1914, as part of the state building code and remained unchanged until July 29, 1942, when it was amended and renumbered 5410. Such original Order 5409 provided as follows:

"*Trap doors and floor openings.* Every opening through any floor shall be guarded by a substantial enclosure or rail at least three feet high. . . ."

Because Order 5409 was adopted before George Baldauf remodeled the building in 1924 to install the trap door, and

before Baldauf and wife conveyed the premises to the defendant Baldauf Corporation in 1938, we granted plaintiff's motion for rehearing.

Although the state building code does not specifically refer to its provisions as *"safety orders,"* the first paragraph thereof reads as follows:

"The building code has been adopted by the industrial commission in discharge of its duties under sections 101.01 to 101.28, inclusive, of the statutes of Wisconsin. It supplements the requirement of section 101.06, to the effect that 'every employer and every owner of a place of employment or a public building now or hereafter constructed shall so construct, repair, or maintain such place of employment or public building and every architect shall so prepare the plans for the construction of such place of employment or public building as to render the same safe.' "

In *Burling v. Schroeder Hotel Co.* (1940), 235 Wis. 403, 409, 291 N. W. 810, this court referred to Order 5116 (2) of the state building code, relating to handrails on stairways, as a *"safety order."* We are satisfied that old Order 5409 (now 5410) did constitute a safety order, the violation of which would constitute a violation of the safe-place statute.

As such order specifically relates to trap doors, the words "every opening through any floor" thereof must be deemed to embrace trap-door floor openings. As so construed we cannot hold that it is so unreasonable as to be void. Trap doors do present a hazard to safety. The extract from the opinion of the Oregon court in *Staples v. Senders* (1940), 164 Or. 244, 96 Pac. (2d) 215, 101 Pac. (2d) 232, quoted by us in our original opinion (262 Wis. p. 538) states that the court does not question the power of the city council of Portland to enact a regulation abolishing trap doors; and, if a city council might enact such a regulation it would seem that the industrial commission possesses the power to do likewise. Therefore, while the effect of old Order 5409 may be to destroy much of the utility of a trap door, we are not

prepared to hold it to be void on the ground that the commission in adopting it exceeded its powers.

Counsel for the defendant landlord contend that the trap door itself without a railing constitutes an "enclosure" of the trap-door opening within the meaning of old Order 5409, and therefore no railing was required. In order to pass upon this contention, it is necessary to resort to the definitions of the word "enclosure."

Webster's New International Dictionary (2d ed.), defines the noun "enclosure" as follows:

"1. Act of enclosing; state of being enclosed, shut up, encompassed, or cloistered; specif. the separation of land from common ground by a fence or barrier. See Inclosure.

"2. That which is enclosed, or placed within something: (a) A space enclosed, or fenced-up. (b) A thing enclosed in a package, as a letter in the envelope with another.

"3. That which encloses, as a barrier or fence."

The definition of the noun "enclosure" in Funk & Wagnall's New Standard Dictionary of the English language is as follows:

"1. The act of enclosing, or the state of being enclosed; especially, the fencing of land to separate it from other or common lands; hence, the reduction of things common to private appropriation.

"2. An enclosed object or space. Especially: (1) A piece of land surrounded by a fence, wall, hedge, or the like. (2) Anything enclosed in an envelope, wrapper, or letter, as a check or sample. (3) That which encompasses, encloses, or shuts in, as a fence, wall, case, or wrapper. (4) Petrol. Inclusion, inclosure.

"Syn.: See Boundary, Circumference."

42 C. J. S., p. 524, defines "inclosure" or "enclosure" as follows:

"In general, that which encompasses, encloses, or shuts in, as a fence, wall, case, or wrapper; also, that which is enclosed, or placed within something; and, specifically applied to land, a term which signifies land inclosed with some visible

and tangible obstruction, such as a fence, hedge, ditch, or the like; and so a wall, hedge, or fence, under circumstances showing a substitution of one for the other, has been held sufficient to constitute an enclosure."

A trap door covers the opening beneath it rather than "encloses" the same, and nowhere do we find the word "covers" in any of the foregoing definitions. We deem that there is implied within the meaning the word "enclosure," as used in said safety order, an encompassing or surrounding of the opening, and if this be true, obviously the trap door itself is not an "enclosure."

We therefore construe old Order 5409 as having required that the trap-door opening, when it was originally cut through the floor in 1924, should have been protected by a substantial railing or barricade at least three feet high surrounding the opening, except the north side from which the stairs led down to the basement below. While this safety order contains no exception with respect to that end of the opening from which the stairs led down, such exception must be implied, otherwise the stairway would be unusable.

The expert witness for plaintiff, Arthur L. Seidenschwartz, an architect, stated that a "removable guard" could have been provided at the north end of the opening "so that anybody, when they wanted to go to the basement, would have to remove the guard to go down." In that way, the stairs would be enclosed on all four sides. Another expert witness, Arthur C. Dietrich, an engineer, testified that he would not recommend erecting a barricade which would prevent anybody from using the stairway, but recommended a barricade, or gate, or railing, which could be moved so as not to destroy the utility or use of the stairway. The testimony of these two expert witnesses would make it a jury question as to whether the failure to provide such a removable guard or gate for the north end of the trap-door opening (from which the stairway led to the basement) constituted a violation of the safe-place statute.

The requirement of the safety order that all but the stairway end of the opening be enclosed with a substantial rail or barricade at least three feet high destroys in a large measure the utility of a trap door because it makes unavailable for use the floor area within the railing so that the use of a trap door would thereby be very little more advantageous than an ordinary partitioned-off stairway, and a jury, by finding a violation of the safe-place statute in not providing such a removable guard or gate at the north end of the opening, would not be requiring "the unreasonable" of the owner who constructs such a stairway and trap-door opening.

Counsel for the defendant landlord contend that even though this court does find that old Order 5409 required a rail or barricade to be constructed by Baldauf around the trap-door opening when he installed the trap door, nevertheless, the Baldauf Corporation having never possessed the right of possession or re-entry to the premises since acquiring the title in 1938, so as to enable it to comply with the safety order, cannot be held liable in this action for failure to comply with such safety order. However, when the Baldauf Corporation acquired title in 1938, the building was structurally unsafe because of the failure to have complied with Safety Order 5409, and such corporation, by its voluntary act of acquiring title, stepped into the shoes of the previous owner with respect to the liability imposed by the safe-place statute to future frequenters of the premises arising by reason of such structural defect. The briefs of counsel, which are replete with authorities on the other points of the case, cite no authorities in point on this particular issue, and we assume the reason therefor is that counsel have been unable in their research to find any. Neither have we. We believe, however, that our conclusion, that the grantee of an owner, who acquires title to a building which is structurally unsafe because of failure of the prior owner to comply with the requirements of the safe-place statute, assumes the liability of "own-

er" to a frequenter who is subsequently injured, is in accord with the legislative purpose underlying sec. 101.06, Stats.

From what has already been said herein, it is apparent that a basis existed for the finding by the jury in its special verdict that the defendant landlord, as owner of the building, failed to have the premises "in the vicinity of the trap door as safe as the nature of the building would reasonably permit . . . in respect to providing an adequate railing around said trap door." As pointed out in the original opinion herein, the defendant landlord cannot be held liable in this respect for failing to enter the premises after it acquired title and provide such railing, because possession was exclusively in the tenant with no right of re-entry in the landlord. The basis of the liability of the present landlord is the result of a condition implied by law under the safe-place statute in the conveyance to it of the leased premises by the former owner because of a then existing structural defect which would have rendered the former owner liable under such statute to future frequenters if he had continued as owner.

This now brings us to consideration of the contention made by counsel for the defendant landlord that prejudicial error was committed by the trial court in instructing the jury that plaintiff was a frequenter, when, as contended by counsel, she was a trespasser. Because of the ground upon which we based the result reached in our original opinion we found it unnecessary to pass upon this last-mentioned issue.

It is claimed that all of the trap-door opening except the north eight inches thereof was so partitioned off by a counter and partition wall from the remaining part of the premises used by patrons of Pulos' cleaning and shoeshine establishment as to clearly indicate that it was reserved for the private use of the proprietor and his employees to which patrons were to have no admittance. Furthermore, there was testimony that Pulos' son warned the plaintiff, before she stepped back into the vicinity of the trap-door opening, not to go

behind the counter and that he called her attention to the danger of the trap-door opening, but that in spite of such warning she did go back of the counter and as a result thereof fell into the opening. However, the trial court in his instructions to the jury stated:

"The plaintiff in this case *was a frequenter* of the portion of the building in question occupied by Mr. Pulos as his place of business as that term has been defined and is used in the statute."

In *Newell v. Schultz Brothers Co.* (1942), 239 Wis. 415, 1 N. W. (2d) 769, the plaintiff, a customer in the defendant's store, walked through a doorway into an areaway and fell down a flight of stairs. There was fastened on the side of the door facing the store proper a large white cardboard sign with large lettering reading, "Employees Only," and it was necessary for plaintiff to pass through such doorway to reach the stairs, but there is no direct evidence whether the door was open or shut at the time. This court held that the conspicuous sign in question in itself constituted due notice and a warning that no invitation to a customer in the store to enter the areaway could be implied, or be deemed to have existed, and therefore plaintiff was a trespasser and not a frequenter. As a trespasser the defendant store owner owed no duty to the plaintiff under the safe-place statute.

Other cases, holding that if there is adequate notice to a frequenter that he should not go into a part of a public building and, in spite of such notice he disregards the same and enters into the forbidden area, he becomes a trespasser so as not to be entitled to claim damages under the safe-place statute, are: *Harder v. Maloney* (1947), 250 Wis. 233, 26 N. W. (2d) 830; *Ryan v. O'Hara* (1942), 241 Wis. 389, 6 N. W. (2d) 209; and *Grossenbach v. Devonshire Realty Co.* (1935), 218 Wis. 633, 261 N. W. 742.

On the basis of the foregoing authorities there was sufficient evidence in the instant case to raise the issue of plaintiff

being a trespasser instead of a frequenter, if she fell into the trap-door opening from the side back of the counter, rather than into the north eight inches of such opening, and it therefore was error for the learned trial court to instruct the jury as a matter of law that she was a frequenter. Counsel for plaintiff urge, that inasmuch as the jury found that the plaintiff was not negligent in going behind the counter in the vicinity of the trap door, this in itself absolved her from being a trespasser. However, the jury in so finding may have been influenced by the erroneous instruction that she was a frequenter. Inasmuch as a new trial must be had, a separate question should be inserted in the special verdict requiring a specific finding on the issue of whether plaintiff was a trespasser at the time and place of the accident. With respect to such question, if the evidence on such issue is substantially the same at the new trial, an instruction should be given which will clearly inform the jury, that if it concludes plaintiff fell into the north eight inches of the opening (which portion of the premises was located within the limits of the public aisle), then the jury should answer such question so as to find that she was not a trespasser.

*By the Court.*—The mandate of the previous opinion is modified so as to provide that judgment is reversed as to the defendant Baldauf Corporation only, and cause remanded for a new trial consistent with this opinion.